**AIR CALEDONIE INTERNATIONAL,**
Plaintiff/Counter–Defendant,

v.

**AAR PARTS TRADING, INC.,**
Defendant/Counter–
Plaintiff.

No. 02–21193–CIV.

United States District Court,
S.D. Florida,
Miami Division.

April 2, 2004.

Lawrence Dean Goodman, Diane Noller Wells, Catherine Fran Hoffman, Robert J. Kuntz, Devine, Goodman, Pallot & Wells, Miami, FL, David C. Birdoff, Fulbright & Jaworski, New York City, for plaintiff.

Gerald Barry Wald, Antonio Arzola, Murai, Wald, Biondo & Moreno, Miami, FL, Paul E. Dengel, Schiff Hardin LLP, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALTONAGA, District Judge.

Pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the following findings of facts and conclusions of law are made. Plaintiff/Counter–Defendant, Air Caledonie International ("ACI"), sued Defendant/Counter–Plaintiff, AAR Parts Trading, Inc. ("AAR"), in connection with an agreement covering the lease of an aircraft engine by ACI (hereinafter "Engine"). On August 12, 2003, the Court found that ACI breached the lease agreement and entered partial summary judgment in favor of AAR as to ACI's liability on AAR's Amended Counterclaim.

In the August 12, 2003 Order, the Court found that although ACI was not liable for preexisting conditions that rendered the Engine unserviceable, it was required to make *all* repairs necessary to render the Engine serviceable at redelivery, regardless of the cause of unserviceability. ACI had the right, however, to be reimbursed for the expense of repairing pre-existing conditions that made the Engine unserviceable, *i.e.*, ACI had the right to seek recovery of expenses incurred by ACI to repair unserviceable conditions that had existed at the inception of the Lease, or the right to have AAR's contractual breach damages reduced by the amount of those expenses. It has already been determined that ACI defaulted on its obligation to redeliver a serviceable Engine at termination of the lease period, but there were

issues of fact regarding whether the unserviceable conditions identified by the facility that inspected the Engine at the end of the lease pre-existed the lease, and whether AAR or ACI had suffered any damages.

At the trial, the Court received evidence, and considered the applicable law and arguments on the issue of the amount of damages, if any, to which AAR is entitled as a result of ACI's breach, as well as the damages, if any, to which ACI is entitled based on AAR's retention of $3,365,900 of ACI's money since September 14, 2001, and $2,679,900 since December, 2002. The Court finds that AAR is liable to ACI in the amount of $2,607,722 for the reasons set forth in the following findings of fact and conclusions of law.

## FINDINGS OF FACT

ACI is a corporation organized and existing under the laws of France with its principal place of business at Noumea, New Caledonia. It is the national airline of that French overseas territory. During the second half of 2001, ACI operated an Airbus A310 aircraft.

AAR was formerly known as AAR Aircraft & Engine Group Inc.. It is a corporation organized under the laws of the State of Illinois with its principal place of business in Illinois. Kellstrom Industries, Inc. ("Kellstrom") is a corporation having a place of business in Florida.

In December, 2000, Kellstrom owned the Engine, a Pratt & Whitney Series 4000 engine, serial number 724857. In January, 2001, EBS Maintenance ("EBS"), an engine consulting firm, prepared a report of a borescope inspection [1] of the Engine conducted by Air Wheels Service ("AWS"). EBS reported that "[s]ome cracks are visi-

---

**1.** A "borescope" is an optical instrument with a light source that is used to examine the interior of turbine engines. Such examinations are performed, *inter alia*, to ascertain the presence of damage in the turbine blades, combustion chamber, and other engine components.

ble on the combustion chamber outer and inner liner, but the bad quality of this video does not provide the complete condition assessment." EBS also reported that there was one T2 blade "tip found with missing material on concave & convex side beyond the limits." [2] Finally, EBS reported some cracks on the "T/E root plates formes" of the T1 blades, but noted that the quality of the video did not "provide the complete condition assessment."

On January 23, 2001 and February 13, 2001, Delta Airlines, Inc. ("Delta") performed two borescope inspections of the Engine at Kellstrom's request and prepared written reports of the results. The January 23, 2001 borescope written report noted "no damage" to the hot or cold sides of the combustion chamber [3] or the T1 blades. As to the T2 blades, the report noted that "1 ea. blade tip material missing." This borescope inspection was not recorded on videotape or in photographs.

The results of Delta's February 13, 2001 borescope inspection were recorded on videotape and still photographs from the videotape. Delta's written report of the February 13, 2001 inspection noted that there were "numerous [T1] blades [that] have inner platform missing coating," and "53(ea) [T1] blades have T/E cracks on inner platform tips & 7(ea) blades have multiple cracks." The report also noted that the there was "1(ea) [T2] blade missing tip cap material." The report further describes the combustion chamber as having "(1) 3 louvers & 1 knuckle cracked @

12:00 position (tape ref 59:15–59:21) on outer liner. (2) 3 louvers/no knuckles plus 2 adjacent louvers cracked on outer liner @ approx 6:00 posknuckles verified on backside of liner (tape ref 1:05:48–1:06:54).(3) 3 louvers/no knuckles cracked on outer liner @ 9:00 position (tape ref 1:10:16–1:10:23)."

On February 15, 2001, Delta issued an FAA Form 8130–3 Airworthiness Approval Tag for the Engine, otherwise known as a "serviceable tag." [4] In late 2000 or early 2001, Timothy Hillman ("Hillman") of Delta advised Kellstrom that ACI desired to lease a Pratt & Whitney Series 4000 engine. Kellstrom and ACI began negotiating the terms of a lease of the Engine.

In March, 2001, Kellstrom performed a borescope inspection of the Engine and issued a written report of that inspection dated March 1, 2001, stating that, in the combustion chamber, there were "2 ea. vanes noted with cracks o.d. buttress area + several louvers with axial cracks on inner comb. + outer combustor, [and] also some minor burning and coating loss." Kellstrom also reported "T-1 T/E minor coating loss noted only at platform area [of T1 blades]." And, Kellstrom reported a "T-2 L/E tip cap minor piece missing on one side only." No other visual defects were noted, and the T2 blade missing material condition was found to be "in limits per P + W E/M 72–00–00–2/0–006 Fig. 803 Sheet 1."

After completing a thrust conversion, Delta issued a serviceable tag for the En-

2. "Beyond the limits" or "out of limits" means outside the applicable standards as set forth in the appropriate manual(s) used to determine serviceability.

3. The combustion chamber consists of two halves, an inner and an outer half, each of which has a hot side that faces the flame, and a cold side, which is where the air comes into the chamber.

4. This "serviceable tag" is a tag affixed to an engine by a duly authorized representative of an FAA-approved facility in accordance with government regulations, indicating that the engine can be placed in service, i.e., installed and used on an aircraft. A "serviceable as-removed tag" is issued by an aircraft operator who is prepared to commit on a form directed to the appropriate government regulator that an engine was serviceable when it was removed from an aircraft.

gine on March 22, 2001. On March 27, 2001, ACI leased the Engine from Kellstrom pursuant to an "Aircraft Engine Lease Agreement" (the "Lease"). The Lease was expressly subject to the terms and conditions of another instrument entitled "Engine Lease General Terms Agreement" (the "GTA"). ACI leased the Engine for use on its Airbus A310 while its own engine was undergoing repairs. The initial Lease term expired on June 24, 2001. After the February 13, 2001 inspection, the Engine was not operated until the ACI Lease commenced (Pre–Trial Stipulation, ¶ 22); therefore, the findings of the Delta examiners from the February 13 inspection describe the condition of the Engine as of the beginning of the Lease term the following month.

The Lease provided that ACI would have a 10–day inspection period after the Delivery Date of March 27, 2001, and that at the end of the Lease, ACI would redeliver the Engine to Kellstrom's address in Miramar, Florida. (Lease, §§ II, VI). Among the "Return Conditions" provided in Section VII of the Lease, was the requirement that ACI would return the Engine at the end of the Lease with a "serviceable tag," and with a "borescope report and video." (*Id.*, § VII). The "Daily Rent" that ACI would pay for the Engine was set at $3,300 per day "or any part thereof." (*Id.*, § VIII). The "Use Fee" would be "$295/hour when the ratio of hours to cycles is greater than 4:1," and "$325/hour when the ratio of hours to cycles is less than 4:1." (*Id.*). A minimum of 200 hours and/or cycles per month was required. (*Id.*). The following amounts were also to be paid by ACI to Kellstrom prior to the Delivery Date: "Prepaid Rent" in the amount of $102,300 (to be applied to the last month of rent); a "Prepaid Use Fee" of $59,000 (to be applied to the last month of use); and a $204,600 "Security Deposit." (*Id.*). Finally, the Lease called for a letter of credit (the "Letter of Credit") in the amount of $3 million and "in a form acceptable to [Kellstrom], for the purpose of securing [ACI's] obligations under the Lease." (*Id.*).

The GTA contained additional terms and conditions. Kellstrom would deliver the Engine to ACI "with a valid FAA serviceable tag affixed to it." (GTA, § 3.a.). The parties agreed that the "Daily Rent" would "commenc[e] with the Delivery Date specified in the Lease and continu[e] until the return of the Equipment in accordance with the terms of this GTA and the Lease (measured portal-to-portal)." (GTA, § 4.a.i.). ACI would pay Kellstrom the Use Fee "for each hour of Engine operation or fraction thereof." (GTA, § 4.a.ii.). Section 4.f. of the GTA specified what the Lessor could do with the Security Deposit as follows:

> If Lessee shall fail to pay Daily Rent or Use Fee payments or shall fail to make any other payments required of the Lessee by this GTA or if Lessee fails to maintain the Equipment in accordance with this GTA or if Lessee fails to return the Equipment in the condition described herein or required herein, Lessor may utilize the Deposit to make up the unpaid payment or to provide the appropriate maintenance. If, at the end of the Term of the Lease, the Equipment is returned in accordance with the terms of this GTA Lease and all amounts required to be paid by this Lease are paid in full, then the Lessor shall return the remaining Deposit to Lessee without interest.

Section 4.h. penalized ACI for late payments, and provided:

> If any payment by Lessee to Lessor required under this Lease is not made when due, Lessee shall pay to Lessor an additional amount equal to five percent (5%) of the amount of such late pay-

ment. Such late fee shall compensate Lessor for the administrative and other costs incurred by Lessor because of lessee's late payment. (GTA, § 4.h.).

In a section of the GTA entitled "Compliance with Laws," the parties agreed that "Lessee will comply in all respects with all laws, ordinances, rules, regulations, and orders of all governmental authorities, applicable to the installation, operation and maintenance of all Equipment." (GTA, § 5). The provisions regarding ACI's "Use and Maintenance" of the Engine were contained in Section 6, which provided, in relevant part:

6.a. Lessee will use each Engine only on commercial transport aircraft owned or operated by Lessee and in accordance with the manufacturers [sic] recommended or FAA (or other applicable government agency) approved operating procedures and manuals and instructions in effect from time to time.

\* \* \* \* \* \*

e. In the case of an Engine, if such Engine is rendered unserviceable:

i. Lessee will be permitted to terminate the Lease earlier than the Lease provides (and to adjust the payment obligations accordingly) and to return the Engine to Lessor prior to expiration of the Lease Term provided, however, that Lessee shall be responsible for Lease payments up until the date upon which such Engine is tagged serviceable (not to exceed ninety (90) days after the date such Engine was rendered unserviceable) or, in the event such Engine is damaged beyond economic repair, the date the Agreed Value of such Engine is paid to Lessor;

ii. Lessee shall pay Lessor the reasonable and customary charges to return such Engine to serviceable condition or, at Lessee's option, to itself return such Engine to serviceable condition; [and]

\* \* \* \* \* \*

v. Lessee shall not be liable for conditions that existed prior to delivery of the Engine to Lessee.

Section 16 of the GTA addressed "Return of Equipment," and required, *inter alia*, (1) ACI to "perform or cause to be performed on each Engine immediately prior to its return to [Kellstrom], at [ACI's] sole expense, a full (compressor and turbine section) borescope inspection, a visual inspection and a full performance test cell run," and immediately notify Kellstrom of any defects found during such inspection; and (2) ACI to return the Engine with a "current serviceable tag pursuant to U.S. FAA requirements, except as permitted under Section 6 herein." (GTA, §§ 16.a., 16. c.). At Section 25, the GTA contained the following clause: "This GTA and each Lease entered into hereunder contain the entire understanding of the parties with respect to such Lease and no warranties, representations or undertakings have been made by either party except as expressly set forth in this GTA and the respective Leases(s) entered into hereunder." (GTA, § 25.a.). The GTA was "binding upon and inure[s] to the benefit of the respective permitted successors and assigns of the parties." (GTA, § 25.d.). Moreover, "[t]he remedies afforded a non-breaching party are cumulative and in addition to all other rights in law, equity or otherwise." (GTA, § 25.g.). And, according to the GTA, all terms in the Lease and the GTA "that, by their nature, continue after termination or expiration thereof or redelivery of the Equipment to Lessor including but not limited to Sections 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 16, and 22.g. will survive such termination, expiration, or re-

delivery and continue in full force and effect." (GTA, § 25. f.). Finally, the parties agreed that the Lease and GTA would be construed in accordance with the laws of Florida, except its laws relating to choice of laws. (GTA, § 26).

ACI was provided an opportunity to, and did inspect the Engine before accepting it. Kellstrom had the Engine delivered to ACI in Brisbane, Australia, in April, 2001, at which time AWS, under the direction of Air France Industries ("Air France"), and on behalf of ACI, performed another borescope inspection of the Engine on April 2, 2001. Between December 2000, when the Engine was purchased by Kellstrom, and March 27, 2001, when the Engine was leased to ACI, the Engine was not operated on any aircraft. The Engine was also not operated on any aircraft between March 27, 2001 and April 2, 2001, the latter being the date that AWS inspected the Engine.

In its written report of the April 2, 2001 inspection, AWS noted a "notch" at the end of one T2 blade. AWS did not note any other damage to the T1 blades, the T2 blades or the combustion chamber. AWS' April 2, 2001 borescope inspection was videotaped. The videotapes and still photographs of the February 13, 2001 inspection by Delta, and the April 2, 2001 inspection by AWS, only provide a view of the hot side of the combustion chamber. There is no graphic evidence of the condition of the cold side of the combustion chamber in February, 2001 or at any time prior to ACI's Lease.

Air France also prepared a borescope inspection report based on AWS' findings. Air France's report indicates as to the "outer liner" of the combustion chamber: "1 crack is visible on one louver within the limits IAW AMM 72–00–00 Page 683 fig 640 (See § Annexe)." According to Air France, there was "[a T2] Blade tip found with material brake in Area C on concave & convex side on the limits according to AMM 72–00–00 fig 661 page A643 sheet 2/3." Also, Air France noted that there were some T1 blades "cracked within the limits." Following the inspection in Brisbane, and AWS and Air France having concluded that the Engine was serviceable, ACI accepted the Engine, mounted it to its aircraft and began to operate the Engine in regular commercial service. Pursuant to the Lease and GTA, ACI paid Kellstrom the $204,600 Security Deposit, the $102,300 Prepaid Rent, and the $59,000 Prepaid Use Fee.

On May 31, 2001, AAR purchased the Engine from Kellstrom for $2.7 million. Kellstrom assigned its rights under the GTA and Lease and transferred the Security Deposit, Prepaid Rent and Prepaid Use Fee it had collected to AAR. Thereafter, ACI received notice and acknowledgment of the Lease assignment.

On July 2, 2001, AAR and ACI executed a First Amendment to the Lease (the "First Amendment"), extending the Lease term through August 13, 2001. Under the First Amendment, AAR required ACI to obtain the $3 million Letter of Credit, naming AAR as beneficiary, and entitling AAR to collect if ACI was in default under the Lease. In accordance with the First Amendment, ACI arranged for the Bank of Hawaii to issue the $3 million Letter of Credit, dated July 11, 2001 in favor of AAR. The First Amendment stated that, except as provided, the Lease remained unchanged.

Thereafter, by contract dated July 25, 2001, AAR agreed to sell and the Federal Express Corporation ("FedEx") agreed to buy the Engine for $3.5 million (the "FedEx Contract"). The FedEx Contract consisted of an "Aircraft Engine Sales Agreement" ("FedEx Sales Agreement"), and "Terms and Conditions" ("FedEx Terms and Conditions"). The FedEx Con-

tract called for delivery of the Engine to FedEx to occur on or before August 31, 2001. Delivery and transfer of Engine title were to occur upon receipt by AAR of the $3.5 million purchase price, and "[u]pon transfer of such title to [FedEx], risk of loss, damage to or destruction of such Equipment shall forthwith transfer from [AAR] to [FedEx]." (FedEx Terms and Conditions, § 5. a.). In the description of the Engine, the FedEx Contract specifically indicated it *would not* have a serviceable tag. (Fed Ex Sales Agreement, § 2).

Pursuant to the FedEx Contract, FedEx would have an "Inspection Time Period" within three (3) business days after AAR notified FedEx that the Engine was available for inspection, and prior to delivery. (FedEx Sales Agreement, § V). FedEx's rights to inspect the Engine were expressly set forth as follows:

a. Within the Inspection Time Period [within three (3) days after AAR notified FedEx that the Engine is available for inspection, and prior to delivery], Buyer may perform or cause to be performed an Inspection of the Equipment at the Inspection Location. Upon completion of the Inspection, Buyer shall promptly advise Seller whether or not, in Buyer's sole discretion, the Equipment is acceptable to Buyer. For any Equipment, if Buyer does not perform the Inspection within the Inspection Time Period or does not advise Seller of Buyer's findings promptly after the Inspection, it shall be deemed conclusive that such Equipment is acceptable to Buyer.

b. If Buyer finds that any or all of the Equipment is not acceptable to Buyer, then, within thirty (30) days after receipt by Seller of Buyer's written notice of rejection, Seller will, at its option, either i) cause the Rejected

Equipment to be acceptable to Buyer (and thereafter deliver to Buyer the Equipment formerly known as the Rejected Equipment), or ii) terminate the Agreement. In the event that Seller terminates the Agreement, neither party shall have any further liability to the other for such Rejected Equipment.

(FedEx Terms and Conditions, §§ 3. a., 3. b.). Moreover, the FedEx Contract provided that FedEx bought the Engine in "as is" condition, and that AAR "made no warranties, guarantees or representations of any kind, either express or implied, statutory or otherwise, that shall survive delivery as to the equipment and the components thereof, including but not limited to the condition or airworthiness thereof." (*Id.*, § 8. c.). AAR also made "no representation as to what use or application may be made of the Equipment in the condition in which the Equipment is delivered." (*Id.*, § 8. d.).

The FedEx Contract contained a merger or integration clause, stating that it "contains the entire understanding of the parties with respect to the purchase and sale of the Equipment, and no warranties, representations or undertakings have been made or relied on in entering into this Agreement;" and "[a]ny previous or contemporaneous oral or written communications, representations, agreements or understandings between Seller and Buyer relating to the subject matter hereof are no longer of any force and effect, are superseded and replaced in their entirety by the provisions of the Agreement." (*Id.*, § 15. e.). Moreover, the agreement prohibited oral modifications, stating that "[n]o term or provision in the Agreement may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the

change, waiver, discharge or termination is sought." (*Id.*, § 15. b.).

Sometime before August 13, 2001, AAR and ACI executed a Second Amendment to the Lease (the "Second Amendment"), which extended the Lease term through August 28, 2001 and changed the redelivery location to Delta's facility in Atlanta, Georgia. The Second Amendment also contained the following provisions relating to redelivery of the Engine:

4. Prior to redelivery of the Engine to Lessor and after removal of the Engine from its aircraft in Atlanta, Georgia, Lessee, at its expense, shall arrange for performance of a borescope inspection of the Engine. The Engine need not have undergone a full performance test cell run prior to redelivery.

5. If the borescope inspection does not identify any unserviceable conditions and if the Engine performed in a serviceable manner during the flight into the Redelivery Location, then Lessee shall arrange for a "serviceable as-removed" tag to be affixed to the Engine. If the borescope inspection identified any unserviceable condition or if the Engine performed in an unserviceable manner during the flight into the Redelivery Location, then Lessee, at its expense, shall arrange for repairs to return the Engine to serviceable condition.

6. If, for any, reason, the Engine is not redelivered to Lessor by the end of the business day in Atlanta, Georgia on August 28, 2001, in the condition required by the Lease, as amended hereby, Lessee shall pay to Lessor as agreed and liquidated damages and not as a penalty, the amount of One Hundred Thousand Dollars ($100,000.00) for each day or fraction thereof from and including August 29, 2001 through the date on which the Engine is redelivered to Lessor in the condition required under the Lease, as amended (the "Damages Payment"); provided, however, the Damages Payment shall not exceed One Million Dollars ($1,000,000.00).

(Second Amendment, §§ 4, 5, 6,). By the Second Amendment, ACI's Letter of Credit was also extended through September 14, 2001. (*Id.*, § 7). The Second Amendment stated that, except as provided, the Lease remained unchanged.

On August 28, 2001, ACI transported the Engine to Delta's facility in Atlanta, Georgia. Thus, the Engine was physically redelivered by the date specified in the Second Amendment. ACI planned to have Delta repair certain Engine components, restore the thrust level to what it had been before the Lease, and perform a borescope inspection. ACI engaged EBS to witness, support, and prepare a report on Delta's borescope inspection of the Engine. Delta conducted a borescope inspection of the Engine on August 30, 2001. The Delta borescope inspectors recorded their inspection on videotape, but they only recorded the hot side of Engine, not the cold side. Still photographs were taken of images from the videotape.

On August 30, 2001, after completing the borescope inspection, Delta advised ACI and AAR for the first time via e-mail that the Engine contained conditions that were "out of limits" and that the Engine was therefore unserviceable. Delta reported the following damage to the combustion chamber on August 30, 2001: "1 continuous crack[,] 5 louvers on hot side, 4 louvers and 3 knuckles on cold side, pictures taken. Out of m/m limits. Unserviceable per 4152EM72–00–00 I/C 01D Table 801 & Figure 813 (Sheet 2)." Delta did not find the T1 blades to be unserviceable, although it did note some cracking in the T1 blades. Additionally, Delta reported that

there was "one HPT 2 missing shroud material[,] can see up into blade, tip cap ruptured. Out of m/m limits. Unserviceable per PW 4152 EM 72–00–00 I/C–01F Figure 903 (Sheet 3)."

An EBS report of Delta's August 30, 2001 inspection confirmed Delta's finding that the Engine was unserviceable, noting the following damage: (1) in the combustion chamber: "A/ Outer & Inner liners found with several individual axial cracks within the limits B/ Outer liner found with 1 continuous axial crack (5 louvers cracked) beyond the limits See PIC 01 to 07 C/ NGV Platform cracked within the limits;" (2) in the T1 blades: "90% Trailing edge cracked within the limits;" and (3) in the T2 blades: "1 blade tip found with missing material on concave & convex side beyond the limits See PIC 08 to 11." EBS sent its written report of the inspection to ACI in mid-September, 2001. Like Delta, EBS found that the only two conditions that were unserviceable were the T2 blade and the combustion chamber; the cracking on the T1 blades was found to be "within the limits."

The T2 blade with the missing material and the cracks on the hot side of the combustion chamber are plainly visible in the videotape that was taken of the August 30, 2001 Delta borescope inspection, and they are also visible in the videotape of Delta's pre-Lease February 13, 2001 borescope inspection, as well as in the videotape of the borescope conducted on April 2, 2001 by AWS. The conditions are identical. The experts for ACI and AAR agree that the same cracking existed on the hot side, and the same material was missing (described by the experts as resembling a "grazing cow" or a "stick man") on the T2 blade in February, April, and August, 2001.

The experts disagree about whether the condition on the hot side was a five-louver crack, as described by Delta, or whether it was actually a four-louver axial crack, or a four-louver axial crack intersecting with a circumferential crack. Regardless of what they call it, it is the same condition. The February, April and August, 2001 videotapes all show the same crack extending through louvers 9, 8, 7, and 6.

With respect to the T2 blade, because the same amount of material was missing in February, April, and August, the same exposure to the internal cavity of the blade existed at all relevant times. A blade that is "ruptured" is one that has its internal cavity exposed such that one can "see up into the blade," as the August 30 Delta inspectors described it. The cavity is the area between the two walls of the blade, while the shroud is the material that encases the blades and is immediately adjacent to, and almost flush with, the blade tips. On all three dates captured on video, the same hole was displayed in the convex or front side of the T2 blade that exposed the cooling cavity and went entirely through it to a corresponding hole on the concave or back wall of the blade. The hole went through both walls and the cavity, and one is able to see the shroud through the holes in the front and back sides of the blade.

ACI's expert, John Kelley ("Kelley"), and the February 13 Delta borescope inspectors, referred to the hole as "missing material," while AAR's expert, Robert Gallagher ("Gallagher"), and the August 30 Delta borescope inspectors, called it a "rupture." AWS called it a "notch" in its April, 2001 report. Again, they are all referring to the same condition by different names. Both experts agree that, based on the graphic evidence, the same cavity of the blade was exposed to the same extent in February and August. Both the cracks on the hot side and the "ruptured" T2 blade existed in substantially the same form before the Lease, such

that a "nick" or "notch" did not become a hole because the hole was always there.

There are no videotapes or other graphic evidence that capture the condition of the cold side of the combustion chamber of the Engine, and therefore there is no conclusive evidence of the condition of the cold side at any time. Although there are some photographs taken in August of 2001 that may be of the cold side of the combustion chamber of the Engine, those photographs do not show three cracked knuckles or four cracked louvers on the cold side.

AAR's Chief Engineer, Jerry Strahl ("Strahl"), and ACI's representative, Serve Legrand ("Legrand"), attended the Delta August 30, 2001 borescope inspection. Strahl did not make any written notes or prepare any written reports concerning the inspection. Both Legrand and Strahl have testified that they watched the monitor while the borescope was being performed. Strahl indicated that he was watching the entire time, while Legrand watched most of the time. Legrand took notes during or immediately after the inspection. Legrand testified that he was told by the EBS expert during the inspection that there was a "four louver crack" in the combustion chamber that made the Engine unserviceable. Legrand did not testify about any particular conditions that he noticed during the inspection; he spent most of the time listening to the inspectors discuss the conditions they identified.

Strahl remembers that there were cracked knuckles on the cold side in August, 2001, but he has not testified as to how many knuckles were cracked. He testified that the images he saw of the cold side during the August, 2001 inspection were not very good pictures because it is very difficult to take pictures of the cold side. Strahl was not present for the February, 2001 borescope inspection and so his testimony does not provide a comparison of the condition of the cold side. In-

deed, no one could identify the condition of the cold side on both February, 2001 and August, 2001. The only evidence of the conditions on the cold side of the combustion chamber is contained in the reports of the various borescope inspectors that looked at the Engine pre and post-Lease, and Strahl's testimony about what he observed on the cold side during the August, 2001 inspection. As to its condition in February 13, 2001, the Delta borescope inspectors examined the cold side of the combustion chamber and did not find four louvers or three knuckles cracked, and the Delta report confirms this.

There was expert testimony indicating that it is possible to determine the condition of the cold side of the combustion chamber by examining the hot side. Kelley testified that because the cracks on the hot side were tight in both February and August, 2001, this means there could not have been three continuous cracked knuckles on the cold side because there would be burning or other noticeable damage on the hot side. This is because the knuckles provide the structural integrity of the combustion chamber. "Tight cracks" are cracks that you cannot see through, which means there is no "parting" of the material or "material separation." Kelley admits, however, that if you see tight cracks on the hot side, you cannot assume that there are cracked knuckles. You have to actually look at the cold side to determine if any knuckles are cracked. The experts agree that the only way to confirm the condition on the cold side is to inspect that area.

The Court reviewed the three videotapes of the February 13, 2001, April 2, 2001 and August 30, 2001 borescope inspections. The Court also reviewed the still photographs of certain images on those videotapes. The Court relies on the photographic evidence because it is the only way to see exactly what the borescope

inspectors saw when they decided to "capture" significant damage to the Engine. The photographic evidence is more probative of the Engine's condition than descriptions or judgments made by borescope inspectors. Indeed, the experts' testimony at trial is that borescope inspectors' descriptions are subjective, that they do sometimes miss damage, and that some inspectors may deem a particular engine defect unserviceable when, in fact, that defect does not exist or the damage is within permissible limits according to the applicable manual(s). The Delta inspectors that borescoped the Engine in February and August—Stuart Fitzhugh, Todd Audette, Chris Kollasch and Bryan Prevost—admitted that they did not specifically recall the borescope inspections of the Engine, as they conduct many of these inspections. Gallagher and Kelley have reviewed the borescope reports and the graphic evidence and now disagree with the findings made by the borescope inspectors both with respect to the conditions reported in February and August, and with respect to their serviceability.

ACI has never repaired any of the unserviceable conditions that were identified by Delta and EBS on August 30, 2001. No "serviceable as-removed tag" or any other tag certifying that the Engine was serviceable as of August 30 was ever obtained by ACI.

FedEx paid the $3.5 million purchase price for the Engine pursuant to the FedEx Contract on August 30, 2001. FedEx never rejected the Engine in accordance with the procedures set forth in the FedEx Contract. FedEx never inspected the Engine during the inspection period, and it accepted the Engine by paying the $3.5 million purchase price on August 30, 2001. Upon that payment, title to the Engine transferred from AAR to FedEx on August 30, 2001.

By letter dated August 31, 2001, AAR notified ACI that ACI was in default by failing to return the Engine to AAR in accordance with the terms of the Lease. On September 14, 2001, AAR drew on the $3 million Letter of Credit established by ACI. In addition to the $3 million AAR received from the Letter of Credit, AAR retained the Prepaid Rent of $102,300, the Security Deposit of $204,600, and Prepaid Use Fee of $59,000.

After learning that the Delta inspectors had determined the Engine was unserviceable, AAR obtained several estimates of the cost of repairs necessary to return the Engine to serviceable condition. One estimate was obtained from Pratt & Whitney, the manufacturer of the Engine. Two estimates were obtained from AAR's technical operations department based on the following work scope: "Repair damages HPT to serviceable condition. Replacement of HPT–1 Blades, Repair of T–1 and T–2 Vanes, Replacement of T–1 and T–2 Duct Segments, fuel nozzle and combustor overhaul."

Pratt & Whitney estimated the cost of repairs to be $1,456,400, but its estimate did not provide a breakdown of the repair charges. AAR's technical department developed two estimates, one showing total charges of $1,599,500, and one showing total charges of $1,511,000. The only differences between these two estimates are that the higher one estimated higher charges for labor, the test cell run, and markup for customer supplied material. The repair charges were broken down in the lower $1,511,000 estimate (the "$1,511,000 estimate") as follows:

| | |
|---|---|
| Labor (2,200 hrs at 805/hour) | $176,000 |
| New HPT–1 Blades | $475,000 |
| T–2 Blade Overhaul w/35% fallout | $180,000 |
| T–1 Vanes Overhaul w/20% fallout | $105,000 |
| T–2 Vanes Overhaul w/20% fallout | $105,000 |
| T–1 Duct Segment overhaul | $ 55,000 |
| T–2 Duct Segment overhaul | $ 45,000 |
| Fuel Nozzle overhaul | $ 25,000 |
| Combustion chamber overhaul | $ 75,000 |

| | |
|---|---|
| Consumable/expendables | $ 80,000 |
| Test Cell Run inc. fuel and oil | $ 25,000 |
| Markup for customer supplied material | $ 25,000 |
| T–1 and T–2 Airseals overhaul | $ 35,000 |
| Vendor items (HPT NGV Supports etc.) | $105,000 |

Robert Gallagher testified that the work described in the $1,511,000 estimate is a significant amount because it involves repairs of the hot side of the Engine, where more exotic materials are used, and thus the area with the more expensive parts.

Erik Deutsch ("Deutsch") was the Director of Technical Operations at AAR. The technical operations department is a division of AAR's Engine Sales and Leasing Division. Strahl was Deutsch's immediate supervisor. The duties of the employees in the technical operations department included supporting the marketing staff in Engine Sales and Leasing by conducting pre-purchase inspections of engines, lease return inspections and engine evaluations. Deutsch was asked by Strahl to prepare a suggested work scope for the Engine in December, 2001. Deutsch testified that the $1,511,000 estimate, which he developed, was only "a suggested work scope for the engine in such—in the case where the engine would have to be sent to a shop to be repaired, which was just a—you know, in preparation; if the engine required a repair, what would be required." (Deposition of Erik Deutsch ("Deutsch Depo."), 14:20–24). Deutsch tried to obtain a copy of the videotape of the August 30, 2001 Delta borescope inspection to "verify the conditions of the engine." (*Id.*, 36:15–25; 37:1–4). Deustch did not have the written report or videotape of the August 30, 2001 inspection prior to preparing the $1,511,000 estimate. Deustch also did not inspect the Engine himself. The only information Deutsch had about the condition of the Engine when he prepared the estimate was that Delta had found the Engine unserviceable because of a problem with a T2 blade and cracks in the combustion chamber. Deutsch obtained this information from conversations with Strahl and others.

Strahl testified that his department routinely develops work scopes and estimates for engines that become unserviceable and have to be put into a shop for repair to return them to serviceable condition. Strahl testified that the Pratt & Whitney estimate was a quote obtained from Pratt & Whitney's shop to compare with AAR's own estimates. Strahl was also involved with Deutsch in developing the $1,511,000 estimate. Neither of them communicated with ACI in connection with developing the estimate. Strahl had not seen Delta's written report of the August 30, 2001 inspection, or the videotapes that were taken of the inspection at the time the $1,511,000 estimate was prepared.

According to Strahl there is no backup documentation, such as invoices, bills, etc., of the charges comprising the $1,511,000 estimate. The cost of the parts included in the estimate was based on information obtained from AAR's Parts Division, but there is no documentation of this cost. Strahl admitted that the estimate represented "some of [his] ideas about what might be found if you were to open up the engine." Strahl and Deutsch do not know if the Engine was ever actually opened after August 30, 2001, or whether repairs were ever made to the Engine.

There was no testimony from anyone that was physically present when the Engine was opened up for repairs. The testimony revealed that less expensive refurbished parts rather than new parts may be used to repair conditions in an engine, and the determination of which parts to use depends on the work scope as well as the availability of refurbished and new parts **at the time the repairs are made**. The cost of new engine parts also changes from time to time. Although several witnesses, including Kelley, Gallagher, and Strahl, testified, based on their general knowl-

edge, regarding the repairs that would be required to remedy the conditions identified by Delta, and to comply with applicable laws and regulations, this testimony was speculative because none of these people could say with any certainty what the conditions were when the Engine was opened for repairs.

There was one report introduced into evidence that appears to be a report from either FedEx's own engine shop or a FedEx-affiliated shop, SR Technics (the "SR Technics Report").[5] Although the report discusses the condition of this Engine (identified by serial number) upon disassembly, there is no date on this report. The SR Technics Report does not refer to four cracked louvers or three cracked knuckles on the cold side of the combustion chamber. The SR Technics Report refers to certain conditions found and repairs made, but it does not identify what the work scope was. The document does reflects that it was developed by "Engine Overhaul Engineering," which suggests the work scope may have been an "overhaul" of the Engine. The actual scope (whether to overhaul, refurbish, or render the Engine serviceable) of any repairs made in accordance with the SR Technics Report is not known, nor has it been established, by the greater weight of the evidence, that any repairs at all were made to the Engine by or for the new owner, FedEx. There was no live testimony at trial or by deposition that corroborated or even commented on the findings made in the SR Technics Report. Indeed, there was no mention of this document at trial.

In a "Settlement Agreement" (the "FedEx Settlement Agreement") signed on February 25, 2002, AAR paid FedEx $1,511,000 in connection with repair of the Engine. The FedEx Settlement Agree-

ment states that "after the Delivery Date, it was determined that the Engine had internal damage that existed on the Delivery Date (the 'Engine Damage')." As a result, "AAR has offered to bear FedEx's cost to correct such Engine Damage." The Agreement indicates that the parties' intent was to "settle this matter at this time rather than wait for completion of repairs to correct the Engine Damage." Accordingly, FedEx would pay the purchase price "as full and final settlement of any and all of AAR's obligations to FedEx for the condition of the Engine and the correction of the Engine Damage." (FedEx Settlement Agreement, § 1). By the Settlement Agreement, FedEx released AAR

> from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature, known or unknown, matured or unmatured, absolute or contingent, which any of the Releasing Parties now has, has had at any time in the past, or may hereafter accrue or acquire against [AAR] . . . on account of condition of the Engine, the Engine Damage, or the performance or nonperformance by the Released Parties of any obligations with respect to the condition of the Engine or the correction of the Engine Damage.

(*Id.*, § 2). There is no evidence that FedEx ever asserted any claims against AAR under the FedEx Contract relating to the condition of the Engine when it was delivered to FedEx, or on any other grounds.

Prior to the sale of the Engine to FedEx, AAR had sold and leased other engines and aircraft components to FedEx. In 1992, three engines were sold by AAR to FedEx.[6] In May, 1997, AAR sold Fe-

---

5. The SR Technics Report was admitted into evidence by stipulation of the parties.

6. This is based on the testimony of Jorge Velez ("Velez"), a salesman in AAR's Sales

dEx two airplanes with engines attached. In July, 1998, AAR sold FedEx another aircraft with engines. There were three engines attached to each DC 10 aircraft, so there were nine engines total. On December 15, 1998, AAR and Federal Express entered into a lease agreement whereby FedEx leased three engines from AAR. On November 27, 2000, AAR sold FedEx a single Pratt & Whitney Model JT9D–7R4E1 engine for $3,570,000.

The only individual at AAR who negotiated the sale of engines to FedEx is Velez. The only individual at FedEx who negotiated their purchase through Velez is Jose Pereira ("Pereira"). In this case, Velez negotiated the sale of the Engine to FedEx, through Pereira, on July 25, 2001, and he previously sold the other Pratt & Whitney engine to FedEx, through Pereira, on November 27, 2000. Velez testified that, based on the typical behavior in the market, the sales of these two engines within eight months of each other was very significant. He believed prospects for future business with FedEx were excellent.

AAR's Velez testified that prior to the sale of the Engine, his relationship with Pereira was excellent. Pereira would call Velez to notify Velez of his engine requirements; Pereira was friendly, and he would promptly answer Velez's phone calls and his e-mails. After August 30, 2001, the relationship soured. Pereira became hostile and inaccessible. Velez has testified that, after August 30, 2001, Pereira specifically told him he no longer intended to do business with AAR. The relationship improved somewhat after AAR paid FedEx the $1.5 million settlement, but it soon deteriorated again. Velez has not sold any engines to FedEx after August 30, 2001.

Velez could not identify, let alone quantify, a single business transaction with FedEx that was lost by AAR after August 30, 2001. He did recall one engine that he offered to Pereira. The engine involved was not yet owned by AAR because AAR was in negotiations to purchase it. Pereira was not interested in buying the engine, and therefore, Velez did not purchase it for AAR. According to Velez, the only AAR customer who bought this type of engine was FedEx. Because AAR never purchased the engine and never sold it to anyone, and no other information about this engine was introduced, there is no evidence of the profit AAR could have made from this transaction, had it been completed. It is even uncertain if AAR could have purchased the engine, regardless of Pereira's lack of interest.

According to Velez, the $800,000 profit (AAR bought the Engine from Kellstrom for $2.7 million and sold it to FedEx for $3.5 million) [7] that AAR would have made on the Engine from its sale to FedEx is a "good average return on a typical transaction of this magnitude." (Trial Tr., Vol 2: 79:17–18). Velez indicates that $800,000 is a low side estimate of profits lost based on the most recent transaction. Velez does not rely on any other calculation or methodology to arrive at the $800,000 lost profit amount sought by AAR.

James Vincent ("Vincent"), the Vice President and General Manager of AAR's Engine Sales and Leasing Division beginning on September 2001, testified that he also had a conversation with Pereira of FedEx, during which Pereira told him that AAR was not going to be his supplier of choice and that it would be a long time before Pereira entered into another transaction with AAR. Both Velez and Vincent

and Leasing Division. AAR has not provided any documentation of this 1992 transaction.

7. The $800,000 profit figure certainly changed as a result of the FedEx Settlement Agreement.

have testified that Pereira told them it "would be a very cold day in Memphis" before he bought another engine from AAR. Vincent admitted that he did not have personal knowledge of the volume of AAR's business with FedEx prior to August 30, 2001, or of the profits made on the prior transactions with FedEx. Indeed, he did not review AAR's books and records to see if any transactions with FedEx were made at a profit to AAR. Vincent stated that he "cannot put a dollar value or amount on what the long-term effects are going to be between our company and Federal Express." (Deposition of James Vincent, 54:15–18).

Fred Brostoff ("Brostoff"), Vice President of Contract Administration for AAR Engine Sales and Leasing, did not know the dollar amount of AAR's lost profits. He had no personal knowledge of AAR's lost profits or lost business as a result of the sale of the Engine in unserviceable condition. No one from FedEx ever talked to him about not doing business with AAR after August 30, 2001. Brostoff did not know of any other business that AAR lost with any other customer.

None of AAR's personnel could identify a single business transaction lost by AAR as a result of ACI's breach of the Lease. No FedEx employee testified either at trial or by deposition. Other than the FedEx Contract in 2001, AAR had no contracts with FedEx for future sales. AAR did not offer a computation of average profits per year that AAR earned from prior business with FedEx. There is no proof that FedEx purchased any engines from any source since August 2001 or that FedEx needed engines. There is no proof AAR had engines that FedEx wanted, needed, or could purchase.

As of September 14, 2001, AAR held $3,365,900 of ACI's money, consisting of the $3 million Letter of Credit and the Security Deposit, Prepaid Rent and Prepaid Use Fee. ACI paid the Daily Rent of $3,300 per day (the "Daily Rent") from the date it received the Engine until it was redelivered on August 28, 2001. ACI has never paid the August, 2001 Use Fee for the Engine (the "August Use Fee"), which is $72,178.[8] In December 2002, AAR returned to ACI $686,000 of the monies it previously had withheld, but continued to hold $2,679,900 of ACI's money.

## CONCLUSIONS OF LAW

Having already found ACI to be in breach of the Engine Lease, the remaining issues are: (1) whether the conditions that caused the Engine to be "unserviceable" at Lease expiration existed at or before Lease commencement; (2) whether ACI's failure to redeliver the Engine in serviceable condition caused AAR any damages, and if so, what they were; (3) whether AAR may be entitled to other damages under the Lease; and (4) whether ACI is entitled to a return of any of the monies held by AAR.

Matters that bear upon the execution, validity, interpretation and obligations of a contract are determined, in Florida, by the law of the place where the contract was made, while matters connected with performance are regulated by the law of the place where the contract by its terms may have been provided. *Hammett v. American Bankers Ins. Co. of Florida*, 203 F.R.D. 690, 700 (S.D.Fla.2001). Here, the parties agree it is Florida law that governs the issues raised concerning the interpretation and obligations of the Lease and its performance. And, it is axiomatic under Florida law that "a court cannot rewrite

---

8. The parties stipulated that this is the August, 2001 Use Fee calculated in accordance with the formula set forth in Section VIII of the Lease.

the clear and unambiguous terms of a voluntary contract." *Pol v. Pol*, 705 So.2d 51, 53 (Fla. 3d DCA 1997). *Accord Wood/Fay Realty Group, Inc. v. New Aquarius Corp.*, 842 So.2d 914, 917 (Fla. 3d DCA 2003). Thus, " 'when the terms of a voluntary contract are clear and unambiguous, ... the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.' " *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290–91 (Fla. 11th DCA 2001). To determine if a contract is ambiguous, the court is required to look to the words used as those words are the best evidence of the intent of the parties, and the plain meaning of that language controls. *Rose v. M/V "Gulf Stream Falcon,"* 186 F.3d 1345, 1350 (11th Cir.1999). Every provision of a contract must be given effect and the Court must reconcile any inconsistencies if possible. *Stevens v. Zakrzewski*, 826 So.2d 520, 521 (Fla. 4th DCA 2002).

### ACI's Pre-existing Condition Defense

Section 6.e.v. of the GTA provides ACI the right to seek recovery of, or the right to have AAR's contractual breach damages reduced by, expenses incurred by ACI in repairing unserviceable conditions that existed prior to delivery of the Engine to ACI. The issue, therefore, is the amount of damages owed by ACI to AAR for repairs to make the Engine serviceable, less any repairs of conditions that preexisted the Lease.

■ The GTA and the Second Amendment unambiguously specify both the means by which serviceability is determined, namely a borescope inspection arranged for by ACI, and the time that the determination is to be made, that is, prior to redelivery and after removal of the Engine from ACI's aircraft. (GTA, §§ 6. e. 2, 16. a.; Second Amendment, § 5). If any

unserviceable conditions were discovered during the inspection, ACI would be liable to "return the Engine to serviceable condition." It is immaterial whether or not Delta's and EBS' findings regarding the unserviceability of the Engine as determined from the applicable manual(s) are correct. The conditions that Delta identified as unserviceable were the conditions that were required to be repaired by ACI under the terms of the Lease and the GTA, assuming that the conditions actually existed when the Engine was opened up for repairs. In signing the Lease documents, ACI agreed to repair the unserviceable conditions identified by the Delta August 30, 2001 borescope inspection.

■ ACI has proven that the cracks on the hot side and the "ruptured" T2 blade identified by Delta on August 30 existed in substantially the same form prior to the Lease, as evidenced in the videotapes and still photographs of the February 13 and April 2, 2001 borescope inspections. Although there is no such conclusive proof that four cracked louvers and three cracked knuckles existed on the cold side in August, 2001, there is also no conclusive proof that they did not. The Court was able to view exactly what the borescope inspectors saw on the hot side of the combustion chamber both prior to and at the end of the Lease. Such a view was not available of the cold side. Because there is no evidence showing that Delta was wrong about the condition of the cold side, however, ACI has not met the burden on its affirmative defense of proving that the four cracked louvers and three cracked knuckles on the cold side of the combustion chamber pre-existed the Lease. *See, e.g., Ferry–Morse Seed Co. v. Hitchcock*, 426 So.2d 958, 961 (Fla.1983) (burden of proof on a contractual defense lies with the party raising the defense). With respect to the pre-existing condition

defense, it was ACI's obligation to ensure that the condition of all areas of the Engine was recorded during the borescope inspections conducted on its behalf.

Nevertheless, based on the evidence presented, ACI is only liable to AAR for the necessary repairs to remedy the four cracked louvers and three cracked knuckles that were observed and reported by Delta on the cold side of the combustion chamber of the Engine, and not for the other conditions identified by Delta.

### AAR's Recovery of the $1,511,000 Payment to FedEx for Cost of Engine Repairs

The cost of repairs of the four cracked louvers and three cracked knuckles on the cold side of the combustion chamber, and any other repairs that were required in accordance with the applicable manual(s) once the Engine was opened up to fix those specific conditions, assuming the conditions existed, are the true measure of AAR's actual damages from ACI's breach. AAR seeks recovery of its $1,511,000 cash settlement with FedEx as a proper measure of damages to compensate AAR for the cost of repairs necessary to remedy the unserviceable conditions identified by Delta. AAR, however, has not sustained its burden of showing such sum to be a reasonable measure of its damages for which ACI is responsible.

ACI is liable to make any repairs required in accordance with the applicable manual(s) once the Engine is opened up to repair the four louvers and three knuckles on the cold side because the Lease documents require ACI not only to repair the unserviceable conditions identified by its borescope inspection at the end of the Lease, but also to "return the Engine to serviceable condition." (GTA, § 6.e.ii.; Second Amendment, ¶ 5). Read together, the clear and unambiguous provisions of the Lease documents require ACI to re-

pair the unserviceable conditions that did not pre-exist the Lease, in addition to the other conditions that must be repaired according to the applicable laws and regulations once the Engine is opened. This is because Section 5 of the GTA provides that "Lessee will comply in all respects with all **laws, ordinances, rules, regulations, and orders of all governmental authorities**, applicable to the installation, **operation** and **maintenance** of all Equipment." (emphasis added). Importantly, with respect to **"use and maintenance,"** the GTA requires ACI not only to repair all unserviceable conditions **at Lease end**, except pre-existing conditions, but also to "use each Engine . . . in accordance with the **manufacturers [sic] recommended or FAA (or other applicable government agency) approved operating procedures and manuals and instructions in effect from time to time."** (GTA, §§ 6.a., 6.e.ii, 6.e.v.) (emphasis added). Thus, ACI was required to comply with all applicable laws, ordinances, rules, regulations, orders, operating procedures, instructions and manuals of all applicable governmental authorities, including the Federal Aviation Administration ("FAA"), in effect at the time of the repairs. Further support of this requirement is Section 16.c. of the GTA, which requires ACI to return the Engine with a serviceable tag according to "FAA requirements."

Therefore, if, according to the applicable manual(s), it is necessary to repair the pre-existing cracks on the hot side of the combustion chamber in order to repair the cracks on the cold side, and presumably it is so because it was described by Delta as "1 continuous crack" with damage on both the hot and cold sides, then ACI is also responsible to repair the cracks on the hot side, and any other conditions that require repair or replacement based on the applicable manual(s), etc., once the Engine is opened for repairs. Nonetheless, although

AAR may recover such repair costs according to the Lease documents, AAR must still prove that it suffered these actual damages before it may be entitled to recover them. Under Florida law, a breach without more only entitles the non-breaching party to nominal damages. *Destiny Const. Co. v. Martin K. Eby Const.*, 662 So.2d 388, 390 (Fla. 5th DCA 1995); *Beverage Canners, Inc. v. Cott Corp.*, 372 So.2d 954, 956 (Fla. 3d DCA 1979). Moreover, AAR must prove that the damages it claims to have suffered were *proximately* caused by the breach. *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784 (11th Cir. 1999). "Florida contract law allows plaintiffs to collect only those damages either arising naturally from the breach or contemplated by the parties at the time of the contract." *Pinnacle Port Cmty Ass'n v. Orenstein*, 952 F.2d 375, 379 (11th Cir. 1992). In other words, recoverable damages are limited to those which "could have been reasonably expected to flow from the breach." *Bland v. Freightliner LLC*, 206 F.Supp.2d 1202, 1211 (M.D.Fla.2002) (quoting *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1532 n. 11 (11th Cir. 1985)). *See also Scott v. Rolling Hills Place Inc.*, 688 So.2d 937, 940 (Fla. 5th DCA 1996) (on rehearing, citing the long-established rule of *Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854), that "[d]amages which flow naturally from the breach, and were foreseeable by the breaching party at the time the contract was entered, are recoverable.").

The underlying purpose of breach of contract damages is to place the non-breaching party in the same position it would have been in but for the breach. *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1326, 1328 (S.D.Fla.1999). Under contract law, an injured party may look to the legal system to place it in the position it would have been in had the bargain been performed as agreed to; in other words, to achieve its expectation interest. *MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir.1999).

■ Another relevant principle of contract law in Florida is the principle of "avoidable consequences," which "is that one seeking damages as a result of another's act cannot recover those damages which he could have avoided by the exercise of reasonable care." *Jenkins v. Graham*, 237 So.2d 330, 332 (Fla. 4th DCA 1970). *See also Moses v. Autuono*, 56 Fla. 499, 47 So. 925, 927 (1908) ("If the plaintiff by reasonable exertions or care could have prevented damages resulting to him by reason of the defendant's breach of the contract, it was his duty to do so, and so far as he could have prevented losses to himself he cannot recover damages therefor.") (citations omitted); *Graphic Assoc., Inc. v. Riviana Restaurant Corp.*, 461 So.2d 1011, 1014 (Fla. 4th DCA 1984) ("The doctrine of avoidable consequences, commonly referred to as a duty to mitigate damages, prevents a party from recovering those damages inflicted by a wrongdoer which the injured party 'could have avoided without undue risk, burden, or humiliation.' ") (citing Restatement (Second) of Contracts § 305(1) (1979)); *Banks v. Salina*, 413 So.2d 851, 852–53 (Fla. 4th DCA 1982) (self-incurred delay in repair of roof leaks caused by buyers' unreasonable demand that roofing companies "guarantee" their work triggered doctrine of avoidable consequences as to buyers, who had duty to mitigate their damages and carry out roof repairs themselves); *Winter v. Am. Auto. Ass'n*, 149 So.2d 386, 387 (Fla. 3d DCA 1963) ("In an action on a contract, if a plaintiff [by reasonable exertion of care] can prevent damages resulting to him by reason of the defendant's wrongful acts, it is his duty to do so and, so far as he can thus prevent them, he cannot recover

therefor.") (bracketed text in original). *Accord Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 921 (11th Cir.1987) ("A party cannot recover damages he [or she] could have prevented through the exercise of reasonable care and diligence."); *Tampa Pipeline Transport Co. v. Chase Manhattan Serv. Corp.*, 928 F.Supp. 1568, 1579 (M.D.Fla.1995) ("A party wronged by a breach of contract ... has an affirmative obligation to take reasonable steps to avoid, or minimize, loss.").

These general principles of contract law relating to mitigation of damages of course also apply to lease agreements. *See, e.g., Young v. Cobbs*, 110 So.2d 651, 653 (Fla. 1959); *BVA Credit Corp. v. Fisher*, 369 So.2d 606, 609 (Fla. 1st DCA 1978); *Brewer v. Northgate of Orlando, Inc.*, 143 So.2d 358, 361–62 (Fla. 2d DCA 1962) (citations omitted). As stated by the Florida Supreme Court in *State ex. rel. Dresskell v. City of Miami*, 153 Fla. 90, 94, 13 So.2d 707 (1943):

> The principle of 'avoidable consequences' upon which the reduction of damages rule is grounded .... finds its application in virtually every type of case in which the recovery of a money judgment or award is authorized.... It addresses itself to the equity of the law that a plaintiff should not recover for those consequences of defendant's act which were readily avoidable by the plaintiff.

Article 2A of the Uniform Commercial Code ("UCC"), as codified in Florida as Chapter 680 of the Florida Statutes, known as the "Uniform Commercial Code—Leases," also governs lease transactions. *See* FLA STAT. § 680.1021 ("This chapter applies to any transaction, regardless of form, that creates a lease."). The applicable UCC provisions that set forth a lessor's remedies upon a lessee's default are Sections 680.523, 680.527, 680.528, 680.53, and 680.532. Section 680.523 is the general provision addressing the lessor's remedies, and provides, in relevant part:

> (1) If a lessee wrongfully rejects or revokes acceptance of goods or fails to make a payment when due or repudiates with respect to a part of the whole then, with respect to any goods involved ... the value of the whole lease contract is substantially impaired (s.680.51), the lessee is in default under the lease contract; and the lessor may
>
> (a) Cancel the lease contract (s.680.505(1));
>
> \*　\*　\*　\*　\*　\*
>
> (e) Dispose of the goods and recover damages (s.680.527), or retain the goods and recover damages (s.680.528), ...; or
>
> (f) Exercise any other rights or pursue any other remedies provided in the lease contract.
>
> (2) If a lessor does not fully exercise a right or obtain a remedy to which the lessor is entitled under subsection (1), the lessor may recover **the loss resulting in the ordinary course of events from the lessee's default as determined in any reasonable manner, together with incidental damages, less expenses saved in consequences of the lessee's default.**
>
> (3) If a lessee is otherwise in default under a lease contract, the lessor may exercise the rights and pursue the remedies provided for in the lease contract, which may include a right to cancel the lease.

(emphasis added).

Section 680.527(1) permits the lessor, after a default by a lessee, to "dispose of the goods concerned or the undelivered balance thereof by lease, sale or otherwise." If the disposition is by sale, the lessor may recover from the lessee under Section 680.528 as if the lessor had elected not to

dispose of the goods. Section 680.528(1)(c) provides that a lessor may recover (1) "[a]ny **incidental damages allowed under s. 680.53, less expenses saved in consequence of the lessee's default;**" and Section 680.528(2) provides that "[i]f the measure of damages provided in subsection (1) is inadequate to put a lessor in as good a position as performance would have, the measure of damages **is the present value of the profit, including reasonable overhead, the lessor would have made from full performance by the lessee, together with any incidental damages allowed under s. 680.53, due allowance for costs reasonably incurred and due credit for payments or proceeds of disposition.**" (emphasis added). A lessor's incidental damages under Section 680.53 "include any **commercially reasonable charges,** expenses, or commissions incurred in stopping delivery, in the transportation, care, and custody of goods after the lessee's default, **or in connection with return or disposition of the goods, or otherwise resulting from the default.**" (emphasis added). Finally, Section 680.532 recognizes the right of the lessor to recover from the lessee for failure to comply with the lease obligations as to the condition of leased goods when returned to the lessor, and provides that, "[i]n addition to any other recovery permitted by this chapter, the lessor may recover from the lessee an amount that will **fully compensate the lessor for any loss of or damage to the lessor's residual interest in the goods caused by the default** of the lessee." (emphasis added).

■ In the present case, AAR claims the $1,511,000 estimate obtained from its technical operations department is a reasonable measure of the repairs necessary to repair the unserviceable conditions identified by Delta. The undersigned does not agree. This estimate was not a fixed price quotation and was even subject to further revision. Furthermore, AAR admits the estimate includes repairs of the cracks on the hot side of the combustion chamber and of the T2 blade missing material, which are acknowledged to be pre-existing conditions for which ACI is entitled to a credit. There has been no showing that the entire $1,511,000 amount is necessary to rectify the breach by ACI of its obligations regarding redelivery of the Engine. One expert, Gallagher, even testified that the work described in the $1,511,000 estimate is a significant amount because it involves repairs of the hot side of the Engine, which contains the most expensive parts. Significantly, ACI was not necessarily required to repair the hot side, unless such work was required by the applicable manuals once the Engine was opened.

Another problem with the estimate is that there was no reliable evidence of what was discovered if and when the Engine was opened up for repairs, presumably by the new owner, FedEx. This is important because ACI would only be liable to AAR for the repairs that were necessary to fix the condition on the cold side of the combustion chamber, and any conditions that were observed, and were required by the applicable manual(s) to be repaired, when the Engine was opened. The SR Technics Report does not provide the necessary information, the most crucial missing information being the work scope of the repairs referenced. More importantly, there is no explanation of how the findings made in the SR Technics Report comport with ACI's requirements under the Lease.

Delta identified the four cracked louvers and three cracked knuckles on the cold side as unserviceable in August, and ACI was liable to repair this condition, unless, of course, when the Engine was opened up, it was discovered that the condition actually did not exist. The Lease documents treat Delta's August 2001 borescope in-

spection as conclusive with respect to the serviceability of the Engine, but not with respect to the condition of the Engine. If instead of four cracked louvers and three cracked knuckles, there were two cracked louvers and one cracked knuckle, *i.e.*, if the condition was different than the condition identified by Delta, ACI would not be liable for repair unless the actual condition of the Engine was determined to be unserviceable by the facility that opened the Engine to repair the condition identified by Delta.

The fact that Delta found some cracking on T1 blades that it determined to be serviceable does not bind ACI to repair these, unless the condition of these T1 blades is confirmed upon opening of the Engine and the facility making the repairs determines that they must be repaired in accordance with the applicable manual(s). This is also true of every other condition found in any of the borescope inspections of the Engine, including the four cracked louvers and three cracked knuckles on the cold side of the combustion chamber reported by Delta in August 2001; the condition would first have to be confirmed upon disassembly of the Engine. If the condition was identified by Delta, the condition would have to be repaired by ACI, regardless of its actual "unserviceability." However, if the condition was different, the repair facility would be required to refer to the applicable manual(s) to determine if the condition required repair.

Due to ACI's limited contractual liability for repairs of the unserviceable conditions that did not preexist the Lease and any other repairs required by applicable manual(s), the Court simply cannot draw inferences from the evidence presented about the condition of the Engine when it was opened up. Damages cannot be based on speculation or guesswork, but must have some reasonable basis in fact. *Smith v. Austin Dev. Co.*, 538 So.2d 128, 129 (Fla. 2d DCA 1989) (landlord not entitled to recover restoration damages after tenant breached lease based upon landlord's claim that $15,000 would be a "fair assessment" of the restoration charges). Testimony consisting entirely of approximations and estimates is insufficient to support a verdict. *See Tolin Mfg. Corp. v. Roy Feiner Handbags, Inc.*, 173 So.2d 714 (Fla. 3d DCA 1965). *See also George Hunt v. Dorsey Young Construction, Inc.*, 385 So.2d 732 (Fla. 4th DCA 1980) (citing *Hodges v. Fries*, 34 Fla. 63, 15 So. 682 (Fla.1894)) ("Evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty.").

In *Smith*, the court overturned a damage award to a lessor who restored damaged premises to their original condition at lease-end because the lessor failed to present competent evidence to support the damage claim. 538 So.2d at 129. The lessor's general manager testified $30,000 was expended to restore the premises and build new space and $15,000 would be a "fair assessment" of the restoration charges. *Id.* "[N]o bills, estimates, invoices, receipts, or other evidence was admitted to support the $30,000 figure." *Id.* Instead, the general manager stated his belief that $15,000 was "a good gauge" of the amount spent on restoration, though he had no personal knowledge of the work actually done or the itemized costs. *Id.*

AAR's evidence was just as speculative as the evidence presented in *Smith*. Strahl, who led the technical team at AAR that developed the $1,511,000 estimate, did not have personal knowledge of the condition of the Engine at the relevant time, *i.e.*, when it was opened up for repairs. Strahl had been present during the Delta August 30, 2001 borescope inspection, but he admittedly did not take notes and he and Deutsch did not have the borescope tape, photographs or report of the August

30, 2001 inspection available to them at the time they developed the estimate.

Admittedly, under *Smith*, certainty of damages is not required, but only "some reasonable basis in the evidence to support the amount awarded." 538 So.2d at 129. Therefore, repair estimates may be appropriate sources of proof in some cases. Certainly, it is not necessary to ascertain the precise amount that FedEx paid if and when it repaired the Engine. However, in order to have a "reasonable basis," for an award, given the terms agreed to by the parties, it is necessary to know precisely what conditions FedEx discovered when it opened the Engine, and what conditions had to be repaired according to the applicable rules and regulations to return the Engine to serviceable condition, because those findings would substantially affect the amount of AAR's damages. The Court cannot make this determination based on the insufficient evidence presented.

In short, AAR has not proven that the $1,511,000 estimate corresponds to repairs for which ACI alone is responsible. The speculative nature of the evidence does not even permit the Court to break down the $1,511,000 estimate into parts and award the repair costs of only certain items. The only item on the estimate that corresponds to repairs of the combustion chamber is for "combustion chamber overhaul," estimated at $75,000. Because there is no testimony regarding the condition of the combustion chamber when it was opened up, there is no evidence to support such an "overhaul" of the combustion chamber. It has not even been established by AAR that the four cracked louvers and three cracked knuckles on the cold side of combustion chamber existed when the Engine was opened. The SR Technics Report made no mention of the existence of this condition on the cold side. The Lease documents entitle AAR to a "serviceable" Engine, not necessarily an "overhauled" Engine. Every other item on the estimate is speculative because it is not known how many hours of labor would be necessary to repair the Engine, how many T1 blades would be replaced, whether it was necessary to overhaul the T1 and T2 duct segments, etc. All of these determinations would necessarily have to be made when the Engine was opened up.

AAR has therefore failed to prove its actual damages under the Lease. AAR is not entitled to nominal damages either because AAR mitigated all damages it may have suffered by selling the Engine to FedEx in "as is" condition and **without a serviceable tag.** Based on the clear and unambiguous language of the FedEx Contract, FedEx was responsible for any repairs to render the Engine serviceable. Only written, signed modifications of the FedEx Contract were permitted. The FedEx Settlement Agreement was the only written modification of the FedEx Contract, and it also does not establish that AAR had any obligation to FedEx with respect to the condition of the Engine after the sale was completed.

■ AAR also relies on the fact it made the $1,511,000 payment to FedEx to support a finding that such amount is a fair measure of its damages. While AAR's $1,511,000 payment to FedEx came after ACI's breach, this merely establishes a temporal connection. ACI's breach is not the proximate cause of the payment because there is absolutely no evidence that AAR had a legal obligation to pay FedEx any amount for repairs based on the unserviceability of the Engine for which ACI was responsible. Furthermore, the $1,511,000 payment was not foreseeable by ACI when it entered into the Lease with AAR because, under Section 6. e. ii., ACI was given the option to make the repairs itself to return the Engine to serviceable condition. It was simply not foreseeable that AAR would sell the Engine in unser-

viceable condition two days after it was returned by ACI, and then shortly thereafter decide to pay its customer an estimate to repair the Engine, without opening up the Engine to identify the conditions that needed to be fixed, and without consulting ACI.

AAR was able to "avoid the consequences" of ACI's breach by selling the Engine in "as is" condition, but without obligation chose not to. AAR argued that FedEx could have rescinded the sale if it was dissatisfied with the condition of the Engine even after FedEx paid the purchase price. AAR relied on Section 3 of the FedEx Terms and Conditions, which provided FedEx an opportunity to inspect the Engine and reject it within a "reasonable time." FedEx, however, never rejected the Engine in accordance with the procedures set forth in the FedEx Contract. FedEx never inspected the Engine during the inspection period, and it accepted the Engine by paying the $3.5 million purchase price on August 30, 2001.

Not surprisingly, however, FedEx did accept AAR's gratuitous $1,511,000 payment. Under the circumstances, AAR should not be permitted to recover for a payment to FedEx that could have been avoided, and which it had a legal duty to avoid. As held in *Banks*, such self-incurred damages are not recoverable under the doctrine of avoidable consequences. 413 So.2d at 852–53.

The "Settlement Agreement" between AAR and FedEx also does not indicate that AAR had any obligation to FedEx. This Agreement states that "AAR has of-

fered to bear FedEx's cost to correct such Engine Damage [the internal damage that existed on the delivery date to FedEx]," and that "AAR and FedEx **wish** to settle this matter at this time rather than wait for completion of repairs to correct the Engine Damage." (emphasis added). Nowhere in the FedEx Settlement Agreement does it indicate that FedEx was asserting or had asserted any claims against AAR in relation to the Engine purchase, nor does it indicate that AAR had breached any obligation to FedEx under the FedEx Contract. There is no other evidence that FedEx asserted such claims against AAR. In light of the unambiguous provisions in the FedEx Contract and FedEx Settlement Agreement, AAR has not established that it had a legal obligation to pay FedEx any money for repairs of the Engine. It did, however, have a legal obligation to ACI to mitigate its damages.

If AAR were awarded the $1,511,000, it would be in a better position than it would have been but for ACI's breach. *See Koplowitz v. Girard*, 658 So.2d 1183, 1184 (Fla. 4th DCA 1995) ("A party can neither receive more than it bargained for nor should it be put in a better position that it would have been in had the contract been properly performed"). A correct measure of damages is that amount that would make the "work performed or article furnished conform to the contract." *Id.*

█ AAR would also not be entitled to recover the $1,511,000 payment under UCC law. Neither contract law nor the UCC permits lessors to recover without showing actual damages.[9] Under Section

**9.** *See, e.g., Florida Drum Co. v. Thompson*, 668 So.2d 192, 193 (Fla.1996) (in action for breach of contract arising out of damage to personal property, plaintiff can only recover for cost of repair and for loss of use that occurs during reasonable period of time for repairs to be accomplished; "any evidence offered to show mitigation would ... be relevant as to a calculation of damages"); *Young,*

110 So.2d at 653 (in action by lessee against lessor for wrongful eviction, lessee was only entitled to recover his "actual expenditures" for permanent improvements that were annexed to realty and were "necessary" to prepare the premises for the specified occupancy, and "defendant would have the right to show that such expenditures were extrava-

680.528, AAR is entitled to any commercially reasonable charges or expenses incurred in connection with disposition of the Engine, or otherwise resulting from the default, less expenses saved in consequence of the default. It would not be "commercially reasonable" to award AAR a windfall of $1,511,000 because this payment was not truly made "in connection with disposition of the Engine," nor did it "result from the default." This amount is also not necessary to "fully compensate" AAR under Section 680.532 because the FedEx contract eliminated any loss or damage to AAR's residual interest in the goods. After its sale to FedEx, AAR had no interest in the Engine, and no obligations with respect to these goods. Similarly, AAR is not entitled to the $1,511,000 under Section 680.523(2) because this was not a "loss resulting in the ordinary course of events from [ACI's] default."

### AAR's Recovery of Lost Profits from Future Business with FedEx

In order to recover expectation damages, such as lost profits, a claimant must prove: (1) a breach of contract; (2) loss as a proximate result of the breach; (3) the loss was, or should have been within the reasonable contemplation of the parties; and (4) the loss is not remote, contingent, or conjectural and the damages are reasonably certain. *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1317 (11th Cir.2001) (citations · omitted) (applying Florida law). "In order to recover for lost future profits, a party must prove income and expenses of the business for a reasonable time period prior to the alleged breach. If the party presents evidence only of gross receipts or fails to prove expenses with some specificity, an award of damages cannot stand." *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 652 (11th Cir.1992) (citations

gant or unnecessary for the purpose of carry-

omitted) (applying Florida law). Moreover, damages for lost profits, like all contractual damages, must flow from the breach. *See Burger King Corp. v. Hinton, Inc.*, 203 F.Supp.2d 1357, 1366 (S.D.Fla. 2002) (although plaintiff had shown that defendants committed a breach of contract, it had not "demonstrated that its total requested award of lost profits resulted from Defendant's breach.").

Florida law allows a party to prove lost future business even without a "track record." However, the party must prove both (1) that the defendant's action caused the damage, and (2) that there is some standard by which the amount of damages may be adequately determined. *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So.2d 1348, 1351 (Fla.1989). Proof must be made by putting on "competent and substantial" evidence in support of the lost future business claim *Id.* at 1351. "Not only must the measure of damages be calculable to a reasonable certainty, but the cause of the loss must not be speculative." *R.A. Jones & Sons, Inc. v. Holman*, 470 So.2d 60, 71 (Fla. 3d DCA 1985).

AAR's lost profits claim fails because it is based only on speculation. On the foregoing factual findings, there is simply no basis to the claim that AAR could have sold any more engines to FedEx after August 30, 2001. AAR has not established a loss, let alone a loss that was proximately caused by ACI's breach.

Even if AAR had proven that it lost business with FedEx, which it has not done, AAR did not offer a "standard" by which to measure its lost profits. AAR only offered that the Engine would have netted it $800,000 in profit. There was no evidence that its prior transactions with FedEx netted this much profit, or any

ing out the lease agreement").

profit. AAR's entire lost profit claim is based on "profits" made from a single engine sale to FedEx, and it failed to present evidence that similar profits were made on its other engine sales. Thus, AAR falls short of satisfying both prongs of the *W.W. Gay* test.

### AAR's Recovery of Administrative Charges

1. *Daily Rent*

 Pursuant to Section 4.a. of the GTA, ACI was obligated to pay Daily Rent of $3,300 per day (or any part or fraction thereof) from "the Delivery Date specified in the Lease ... until the return of the Equipment **in accordance with the terms of this GTA and the Lease.**" (emphasis added). Both parties stipulate that the Daily Rent provision in the GTA is a liquidated damages clause.[10] AAR argued that ACI's obligation to pay Daily Rent continued for each day that ACI failed to return the Engine in serviceable condition; however, AAR proposed to cut off this obligation ninety days after ACI's return of the Engine (from August 29, 2001 to November 26, 2001) because a ninety-day period was a reasonable time within which to return the Engine to serviceable condition, and because the Lease documents contemplate a ninety-day cap on continuing daily rent obligations. AAR refers to Section 6.e. i. of the GTA, which provides that if the Engine were rendered unserviceable during the Lease term,

> Lessee will be permitted to terminate the Lease earlier than the Lease provides (and to adjust the payment to obligations accordingly) and to return the Engine to Lessor prior to expiration of the Lease Term provided, however, that **Lessee shall be responsible for Lease payments up until the date upon**

**which such Engine is tagged serviceable (not to exceed ninety (90) days after the date such Engine was rendered unserviceable).**

(emphasis added). In contrast, ACI argued that AAR was due Daily Rent only for the two days prior to FedEx accepting the Engine in unserviceable condition.

"It is well settled that in Florida the parties to a contract may stipulate in advance to an amount to be paid or retained as liquidated damages in the event of a breach." *Lefemine v. Baron*, 573 So.2d 326, 328 (Fla.1991) (citation omitted). However, to be a valid liquidated damages clause,

> [T]he court must find, first, that "the damages consequent upon a breach must not be readily ascertainable, and [second, that] the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages."

*MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir.1999) (quoting *Lefemine*, 573 So.2d at 327).

Under this standard, the stipulated Daily Rent amount does not satisfy the first criterion that damages not be capable of ascertainment. Moreover, AAR is not entitled to even two days of Daily Rent, not because it sold the Engine to FedEx in unserviceable condition, but because it cannot seek both actual damages, *i.e.*, repair costs, and liquidated damages, *i.e.*, Daily Rent, based on the same breach. *See, e.g., Lefemine*, 573 So.2d at 327–30 (existence of an option on the part of the aggrieved

---

**10.** A fair reading of the clause is that it merely stipulates a daily rental amount rather than fixing damages that are not capable of being

ascertained, but the Court accepts the parties' undisputed characterization of the clause as a liquidated damages clause.

party to sue for actual damages negated the parties' intent to liquidate damages); *MCA Television Ltd.*, 171 F.3d at 1272 (reasoning in *Lefemine* "applies with even greater force in cases where damages provisions allow the non-breaching party, not a choice *between* two options, each of which would allow a full recovery, but the right to pursue them both") (emphasis in original).

"Under Florida law, when a damages clause is held to be an unenforceable penalty, 'the party seeking to recover for the breach much allege and prove his actual damages.'" *MCA Television Ltd.*, 171 F.3d at 1276 (citing *Stenor v. Lester*, 58 So.2d 673, 676 (Fla.1951) (other citations omitted)). Accordingly, AAR is limited to its actual damages, which it has not proven.

## 2. *The August Use Fee*

 The August Use Fee was an amount due under the Lease and GTA based on a calculation of the ratio of hours to cycles of ACI's use of the Engine in a month. (Lease, § VIII; GTA, § 4. a. ii.). Payment of this amount was not dependent upon a breach. AAR held $204,600 as ACI's Security Deposit and $59,000 as a Prepaid Use Fee since it acquired the Engine from Kellstrom. AAR did not return these amounts to ACI upon expiration of the Lease. Pursuant to Section 4. f. of the GTA, AAR had the right to use the Security Deposit to make up the unpaid payment of the August Use Fee.

As of September 14, 2001, AAR also held the $3 million that it drew down from ACI's Letter of Credit, and as of December, 2002, it held $2,679,900 after it returned $686,000 to ACI. AAR was entitled to the August Use Fee, and was paid this fee when it retained ACI's Security Deposit, the Prepaid Use Fee and drew down on ACI's Letter of Credit. The August Use Fee is $72,178. AAR has had this much of ACI's money since the commencement of the Lease. This amount must therefore be deducted from any amounts AAR now owes to ACI.

## 3. *Late Fee*

Section 4. h. of the GTA provides "[i]f any payment by [ACI] to [AAR] required under this Lease is not made when due, [ACI] shall pay to [AAR] an additional equal to five percent (5%) of the amount of such late payment. Such late fee shall compensate [AAR] for the administrative and other costs incurred by [AAR] because of Lessee's late payment." AAR is not entitled to this late fee because it has not proven its repair costs to return the Engine to serviceable condition, it cannot recover Daily Rent after the redelivery date of the Engine as liquidated damages, and the August Use Fee was not late. In short, there are no payments that were due to AAR upon which to apply the late fee.

## ACI's Recovery of Monies Retained by AAR

The total amount of damages for which AAR is liable to ACI is $2,607,722, which is calculated by deducting the August Use Fee of $72,178 from the amount currently held by AAR, $2,679,900, plus interest and costs.

For all of the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. ACI is entitled to judgment on its Amended Complaint against AAR for $2,607,722, plus interest and costs.

2. AAR shall take nothing by this action and shall go hence without delay.

3. Within **ten (10) days** of the date of this Order, the parties are to submit

proposed calculations on interest and costs, including the methods and formulas used to arrive at the amounts calculated, for inclusion in the final judgment.

4. Final judgment will be entered by separate order in accordance with Fed.R.Civ.P. 58.

5. Any of the foregoing conclusions of law which may represent findings of fact are adopted as findings of fact.